## Case No. 12,805.

SHOOK et al. v. RANKIN et al.

[3 Cent. Law J. 210.] [1]

Circuit Court, D. Minnesota. Sept. 16, 1875.

COPYRIGHT — PRELIMINARY INJUNCTION — PRIMA FACIA CASE—AFFIDAVITS.

A preliminary injunction was applied for to restrain the performance by the defendants of a play called "The Two Orphans." Upon the bill and affidavits the court found: First. That there has been no memorization of this play by the defendants or any body in their employ, which would entitle them without authority from the complainants to represent the play of "The Two Orphans" in this district. Second. That there has been no dedication by any voluntary act, which would prevent the complainants in this case from exclusively representing this play. Third. That the prima facie case made out by the bill has not been overcome by the affidavits which have been presented by the defendants; and thereupon the court awarded a preliminary injunction as asked.

[1] [Reprinted by permission.]

[This was a bill in equity by Sheridan Shook and others against Arthur McKee Rankin and others.]

Motion for a preliminary injunction to restrain the performance by the defendants of the play called "The Two Orphans."

W. P. Clough and L. F. Post, for complainants.

J. H. Davidson, for defendants.

NELSON, District Judge. It is important that there should be a speedy decision of this motion; and while delay would perhaps enable me to present my views more elaborately, and satisfactorily to myself, it would not change the result I have arrived at, and I shall, therefore, proceed to announce my decision in this matter, giving my reasons for it briefly. I think that upon an examination of this case, it will be found that no new principles are involved. The complainants, Messrs. Shook and Palmer, allege that they are owners of the copy-right of a certain play, entitled, "The Two Orphans," derived from an assignment to them by one N. Hart Jackson, who is alleged to have obtained this copyright under the laws of the United States; and they charge the defendants, enumerating them in their bill, with an infringement of their rights in this copy-right, to-wit: that they are now and have been presenting the play copy-righted as aforesaid, and assigned to the complainants, in the city of Saint Paul, in this district, without any authority or license. That is, briefly, the substance of the bill; and upon it, accompanied by the certificate of copy-right and additional affidavits, they ask that a preliminary injunction be granted by this court. The complaint has attached to it, (and the original has been presented,) a copy of the certificate, duly issued in accordance with the laws of the United States, to N. Hart Jackson, and a proper assignment from Jackson as the author or proprietor, to the complainants. They also present with their bill of complaint, the affidavit of N. Hart Jackson, which more in detail sets forth his right to obtain from the government this copy-right, alleging that he is the joint author of this play with some French citizens, and the purposes for which the joint production was translated into English, for exhibition in this country. Now, there is no question if all these allegations are true, and if it shall be established on the final hearing in this cause that the copy-right was legal and valid, that the complainants would be entitled to an injunction. Upon the face of the papers which they present here, they have established what in law is termed a prima facie case, and the burden is thrown upon the defendants, who are charged with an infringement of their right to overcome it. This is valuable property. It has been said that dramatic compositions are the most valuable of all literary works, and there is some reason in it. While authors of literary productions,

as a general thing, are compelled to await the printing, manufacture and sale of their books before they can derive any profit from them, the dramatic manuscript can be readily put on the stage, and if it is an amusing and entertaining production, and well brought out, it immediately becomes a source of profit. If it has a successful run, this profit and value are increased, so that it seems to me the assertion is true in some respects, that the authors' of literary dramatic compositions are entitled to the great protection which has been accorded to them by the copy-right laws of this country, for the reason that they are the most valuable of literary compositions.

Have the defendants overcome the prima facie case which has been established here by the complainants? One of the defendants only, A. McKee Rankin, has put in an answer under oath. He has accompanied his answer with a voluminous affidavit setting forth more in detail the defences which he alleges in his answer to overcome the prima facie case established on the part of the complainants; and in order to defeat the application which is made here, and other affidavits, some of them the affidavits of the co-defendants, and of other parties, relating to other portions of the answer, have also been introduced and read. The defences which are set forth relate, first, to the right of the complainants to the exclusive representation of the play entitled "The Two Orphans;" second, to the authorship which is set forth as belonging to N. Hart Jackson, the immediate assignor of complainants; and so far as the affidavits are concerned, these defenses may be classed as follows: First. That the representation of this play is made from a version obtained from memory, and consequently its representation upon the stage in the Opera House in this city is not an infringement of any rights of complainants. Second. That the complainants themselves have dedicated to the public any rights which they obtained in the assignment to them. Third. The denial of authorship in N. Hart Jackson, who is set forth in the bill of complaint as the proprietor, and joint author with two Frenchmen.

Now, so far as the first line of defence is concerned, let us examine it. It has been claimed, and with some reason, that the presentation of the version of a play obtained by process of memory is an infringement of no rights, either of the author, or of his assignees; and in a very early case, it will be found upon examination that Justice Buller decided in England, that where the version of the play had been obtained by frequent attendance upon its representation, and afterwards produced by the party, it was not an infringement upon the rights of the author, and an injunction was refused. It was refused upon this principle: That a court of justice cannot enjoin the memory of a man; that where a party by mere strength of memory was enabled to commit a play and all its parts, and afterwards write it out with-

out any assistance from the original play itself, it was the exercise of memory alone, and a court would appear ridiculous in attempting to enjoin the memory of a man. It was regarded at the time as a novel precedent; still it has been undisturbed, and a case was decided I think in New York City upon that principle. See article by J. A. Morgan in Am. Law Reg., April, 1875, where Lester Wallack commenced a suit against Barney Williams, some six or seven years ago. He produced upon the boards of his theatre the celebrated play of "Caste," and a short time afterwards Barney Williams also produced the play of "Caste" in another theatre, much to the astonishment of Mr. Wallack, and of everybody else who were informed of the means by which Mr. Williams obtained possession of the play, and of his rights in the premises. Upon suit being instituted by Mr. Wallack, claiming under the common law right, and not under any copy-right, it appeared that the brother-in-law of Barney Williams, Mr. Florence, in his affidavit, testified that he had obtained possession of this play by a process of memory. From frequent attendance at the performance in Mr. Wallack's theatre he had been enabled to make possession of the play, and had actually produced it; which seemed an extraordinary exertion of bare memory, as it was, undoubtedly, if true. When that affidavit was presented, the court in New York declined to grant an injunction, following the precedent laid down in the English case.

Now without discussing the question whether the right of property—the right of an author in his property—depends upon any peculiar process, which may be used in obtaining it from him without his voluntary act, I think that even assuming that a court of equity would not interfere in a case of that sort, this is not the mode in which the version used by defendants was obtained, according to the allegations of the answer. They do not claim that this version which is represented here was obtained by frequent attendance upon the play, and listening to it; but they aver that by familiarizing themselves with it when represented, they being leading actors in the representation, it was memorized. They were not listeners, they were not a portion of the audience, but were persons who had been engaged by the managers who brought out the play, and obtained all they knew by repeating it as actors. So far, therefore, as this defence is concerned, the facts do not bring it within the rule laid down by Justice Buller, even admitting that the decision is founded upon true principles of equity.

Second. Have the complainants in this cause, by any voluntary act, dedicated to the public the right to use this drama, and thus abandoned all exclusive rights as the assignees of the person who obtained the copyright? I see nothing in the defence which would show any publication of this play within the legal meaning of that term as applied to copy-rights. What are the facts? It appears that the complainants authorized the publication of a novel, or what is called an adaptation of "The Two Orphans," in the form of a book, which was purchased by Munroe & Co., in New York. There is no pretence here that Messrs. Shook & Palmer authorized the publication of the drama, with all its gestures, stage entrances, scenic effect, as they were representing them upon the stage of the Union Square Theatre, but they entered into a contract by which they gave to Munroe & Co. authority to publish a novel founded upon the incidents of this drama which they were representing; and it appears from a hasty examination which I made yesterday of the copies presented, that they are substantially the same. It may be admitted that by authorizing this publication founded upon the drama, the complainants dedicated to the public the right to the novel. The question then is, whether the publication of a novel founded upon this drama which is the original act, is an abandonment of the right to exclusively represent the drama. I think the case cited by counsel for complainants in the English reports—Reade v. Conquest, 11 C. B. (N. S.) 479—conclusively establishes the fact that where the drama is the original literary effort, and the novel is based and founded upon the drama, its publication is not such a dedication to the public as will authorize the novel to be dramatised and put upon the stage without the authority of the persons owning the copy-right to the original literary effort.

Third. I come now to the last defence, that is, the one attacking the copy-right. Have the defendants overcome the prima facie case established by the complainants? It is alleged in the answer upon information and belief, that D'Ennery and Cormon, two Frenchmen, are the authors of the play, and not Jackson, and, in order to sustain that allegation, the affidavit of Vandenhoff has been read. He testified that long prior to the taking of the copy-right, but not prior to the allegation in the bill, Jackson was joint author with the Frenchmen, and he saw an English version of "The Two Orphans" which was in all particulars substantially the same as the play, upon the stage in two theatres in London. This version of the play is not produced. There is an allegation in the affidavit of Mr. Rankin, that he expects to produce it; but upon this preliminary motion there is nothing but the mere naked testimony of Vandenhoff that he saw in the London theatres a representation of this play, substantially as played by Shook & Palmer in the Union Square Theatre. Does that overcome the prima facie case charged and alleged in the bill? I think not. If the answer, or affidavits had been accompanied by a copy of this English version of the play, and set forth who was the author of the same, it might present a different case, and lead to a different result.

Now, what is the rule in equity governing a court where a preliminary injunction is

asked? The general rule is (and this case presents no exceptions), where the act charged in the bill is either admitted, or not denied—and here the act charged in the bill is the representation of this play—and the injury which results is not easily remedied if the injunction is refused, a court of equity will grant an injunction unless the bill or the case made out by the bill is absolutely refuted. This is the rule in equity which governs a court in all cases where a preliminary injunction is asked for. It may be that on the final hearing of the case, when all the evidence has been introduced on the part of the defence, and on the part of the complainants, the court will decline to grant the relief which is prayed for; but it is impossible upon a preliminary application of this kind to decide upon the merits. The complainants at final hearing may not show themselves entitled to the permanent relief which they claim, but they ask that so long as they have established a prima facie case, and their right to this property, that a restraining order or a preliminary injunction shall be granted.

Without further elaborating this case, I have arrived at these conclusions:

First. That there has been no memorization of this play by the defendants or anybody in their employ which would entitle them, without authority from the complainants, to represent the play of "The Two Orphans" in this district.

Second. That there has been no dedication by any voluntary act which would prevent the complainants in this case from exclusively representing this play.

Third. That the prima facie case made out by the bill has not been overcome by the affidavits which have been presented by the defendants.

It follows, therefore, necessarily, that an injunction must issue, restraining the defendants from representing the play of "The Two Orphans." Injunction awarded.

[NOTE. This cause was again before the courts for final hearing upon motion for an injunction upon bill and affidavits. It was held that the complainants were entitled to an injunction to prevent the defendants from performing the work which had been translated by N. Hart Jackson, but the defendants were not enjoined from using Oxenford's translation. Case No. 12,804.]